RENDERED: JUNE 13, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1286-ME

W.R. AND C.R.                                                           APPELLANTS


APPEAL FROM RUSSELL CIRCUIT COURT
v.       HONORABLE JENNIFER UPCHURCH EDWARDS, JUDGE
ACTION NO. 24-J-00029-001


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND B.R., A
MINOR CHILD                                                            APPELLEES

AND


NO. 2024-CA-1287-ME

W.R. AND C.R.                                                           APPELLANTS


APPEAL FROM RUSSELL CIRCUIT COURT
v.       HONORABLE JENNIFER UPCHURCH EDWARDS, JUDGE
ACTION NO. 24-J-00030-001


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND C.R., A
MINOR CHILD                                                            APPELLEES

AND

NO. 2024-CA-1288-ME

W.R. AND C.R.                                                   APPELLANTS

APPEAL FROM RUSSELL CIRCUIT COURT
v.          HONORABLE JENNIFER UPCHURCH EDWARDS, JUDGE
ACTION NO. 24-J-00031-001

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND C.R., A
MINOR CHILD                                                   APPELLEES

AND

NO. 2024-CA-1289-ME

W.R. AND C.R.                                                   APPELLANTS

APPEAL FROM RUSSELL CIRCUIT COURT
v.          HONORABLE JENNIFER UPCHURCH EDWARDS, JUDGE
ACTION NO. 24-J-00033-001

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND E.R., A
MINOR CHILD                                                   APPELLEES

AND

NO. 2024-CA-1290-ME

W.R. AND C.R.                                                            APPELLANTS


APPEAL FROM RUSSELL CIRCUIT COURT
v.        HONORABLE JENNIFER UPCHURCH EDWARDS, JUDGE
ACTION NO. 24-J-00034-001


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND P.R., A
MINOR CHILD                                                              APPELLEES

AND


NO. 2024-CA-1291-ME

W.R. AND C.R.                                                            APPELLANTS


APPEAL FROM RUSSELL CIRCUIT COURT
v.        HONORABLE JENNIFER UPCHURCH EDWARDS, JUDGE
ACTION NO. 24-J-00035-001


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND S.R., A
MINOR CHILD                                                             APPELLEES


AND

NO. 2024-CA-1292-ME

W.R. AND C.R.                                      APPELLANTS


                    APPEAL FROM RUSSELL CIRCUIT COURT
v.          HONORABLE JENNIFER UPCHURCH EDWARDS, JUDGE
                       ACTION NO. 24-J-00036-001


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND S.R., A
MINOR CHILD                                        APPELLEES

AND


                         NO. 2024-CA-1293-ME

W.R. AND C.R.                                      APPELLANTS


                    APPEAL FROM RUSSELL CIRCUIT COURT
v.          HONORABLE JENNIFER UPCHURCH EDWARDS, JUDGE
                       ACTION NO. 24-J-00037-001


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND U.R., A
MINOR CHILD                                        APPELLEES

<u>OPINION</u>
<u>AFFIRMING IN PART,</u>
<u>VACATING IN PART,</u>
<u>AND REMANDING</u>

** ** ** ** **

BEFORE:  COMBS, ECKERLE, AND L. JONES, JUDGES.

COMBS, JUDGE:  In these consolidated appeals, Appellants, W.R. (Father), and C.R. (Mother), (collectively Parents), appeal from adjudication and disposition Orders of the Russell Family Court finding that their eight minor children were neglected and ordering the children's continued in-person attendance at Russell County Schools.  The children were not removed from the home.  After our review, we affirm in part, vacate in part, and remand.

The children involved in this appeal are:[1]

1. **Ci.R., female, age 15**, Case No. 24-J-00030,
   Court of Appeals No. 2024-CA-1287-ME;

2. **P.R., female, age 14**, Case No. 24-J-00034,
   Court of Appeals No. 2024-CA-1290-ME;

3. **Co.R., female, age 12**, Case No. 24-J-00031,
   Court of Appeals No. 2024-CA-1288-ME;

4. **Su.R., female, age 10**, Case No. 24-J-00036,
   Court of Appeals No. 2024-CA-1292-ME;

---

[1] We identify these children by their initials and ages as of March 25, 2024, the date the DNA petitions were filed.  The parents also have adult children.  Some of the children's first names begin with the same letter; in that case, we have used the first two letters to distinguish them.

5. **E.R., male, age 8**, Case No. 24-J-00033,
   Court of Appeals No. 2024-CA-1289-ME;

6. **Br.R., female, age 6**, Case No. 24-J-00029,
   Court of Appeals No. 2024-CA-1286-ME;

7. **So.R., male, age 4**, Case No. 24-J-00035,
   Court of Appeals No. 2024-CA-1291-ME;

8. **U.R., male, age 2**, Case No. 24-J-00037,
   Court of Appeals No. 2024-CA-1293-ME.

On March 25, 2024, the Russell County Attorney filed a DNA

(dependency, neglect, and abuse) petition in the Russell Family Court in the

interest of E.R., as follows in relevant part:

> the above-named child was/is . . . ☑ neglected or abused
> . . . pursuant to KRS[2] Chapter 620, and within the scope
> of KRS 610.010(2)(d); Affiant's grounds of belief are:
> SEE ATTACHED

In its entirety, the attachment states as follows:

> On March 18, 2024, during a school board
> meeting, 8 year old [E.R.] walked 3.7 miles one way in
> 37 degree weather with what appeared to be his socially
> impaired 23 year old brother, [Al.R.] to the Auditorium
> at Russell County Schools. Some folks happened to be
> there for a school board meeting, but the boys said they
> were looking for someone who would let [E.R.] come to
> school for one day to learn about dinosaurs because he
> has never gotten to go to school. The DPP[3] and
> Superintendent's Assistant asked [E.R.] if he was in
> homeschool, and he said no. He said that he wanted to

---

[2] Kentucky Revised Statutes.

[3] Director of Pupil Personnel.

read but he could only spell two words: "poop" and "no". [*sic*] When [Al.R.] was asked if [E.R.] was in homeschool, [Al.R.] said that he was able to attend through 1 year of high school and that some of the older children had been homeschooled some, but that the parents had stopped homeschool a few years ago and that the older children had pursued a little education on their own, but the younger children have had no homeschooling at all. [E.R.] was in open/webbed shoes with no socks, appeared to have some matted hair, had fingernails that were caked under with dirt, had dirty feet, and smelled of feces. [Al.R.] said that he had picked up coins along the way and was going to try to buy 50c wings on the way home because he had seen a sign. Because it was 37 degrees outside, an SRO[4] was pulled from the meeting he was in and asked to take the boys home. He got to the end of their driveway and could not enter because it was blocked with a row of trash cans. The boys walked down over the hill and entered the home.

This Affiant has received multiple 115s[5] over the past two years concerning these children. To date, all have been unsubstantiated by the Cabinet. These 115s have mentioned environmental neglect, educational neglect, supervisory neglect, and a host of other issues of neglect concerning this family.

On March 4, 2024, this Affiant received a 115 concerning environmental neglect. Pictures were sent to the Cabinet directly from children in the home demonstrating environmental neglect. As of this date, there has been no action by the Cabinet concerning this report. Now, there is further neglect that has been reported, which was observed by the local DPP and SRO.

---

[4] School Resource Officer.

[5] 115s: presumably a reference to reports involving incidents of suspected neglect. No formal definition has been identified in the record.

On May 25, 2024, DNA petitions were also filed in the interest of each of the seven other minor children. The petitions and attachments are the same as those filed in the interest of E.R. -- except that the petitions also include the language, "risk of harm," as follows:

> the above-named child was/is . . . ☑ neglected or abused
> . . . pursuant to KRS Chapter 620, and within the scope
> of KRS 610.010(2)(d); Affiant's grounds of belief are:
> SEE ATTACHED (RISK OF HARM).

On April 8, 2024, the family court conducted a temporary removal hearing. Cindy Damron, DPP for the Russell County Board of Education; Au.R., another of Parents' children who was then 17 years of age; and Mother testified.

On April 8, 2024, the court entered temporary removal Orders. The court found that Au.R. confirmed that the younger children were not provided homeschool instruction and did not know how to read or do basic math. The court noted that Ms. Damron testified that she spoke with the older children about their education. Au.R., Be.R.,[6] Ci.R., and P.R. all reported that they did very little-to-no homeschool learning; they had learned to read when they were previously in foster care and attended public school. Further, Co.R. (age 12); Su.R. (age 10); E.R. (age 8); and Br.R. (age 6) all confirmed that they cannot read. Several children did not know their own birthdate.

---

[6] Au.R. and Be.R. are twins; they are now adults and are not involved in this appeal.

The family court determined that reasonable grounds exist "to believe the children are at risk of supervisory neglect and educational neglect absent further Court orders." Parents were ordered "to cooperate with CHFS[7] and actively participate in treatment or a social service program." The signed docket sheet Orders entered on April 8, 2024, further reflect that

> [c]ustody remains w/parents contingent upon compliance w/ct. orders as follows: children ages 6-17 to be enrolled in RC Schools 4/9/24 to receive instruction & assessment: no unexcused absences or tardies family shall be offered CHFS services to address lack of supervision & environmental condition of the home.

The family court conducted the adjudication hearing over the course of two days -- June 14, and July 12, 2024.[8] Ms. Damron; Jessie Hopper, an RTI[9] teacher at Russell Springs Elementary School; Steven P. Duvall, Ph.D., Director of Research, Home School Legal Defense Association, Purcellville, VA; and Father and Mother testified. By agreement, the testimony of Au.R. and Mother from the temporary removal hearing was also considered as part of the record of the

---

[7] Cabinet for Health and Family Services.

[8] Parents state at page 3 of their Brief that the "adjudication finally concluded in July, more than three months after the petition was filed." Parents fail to mention that they bear the responsibility for any delay; *i.e.*, the hearing had to be continued because they failed to disclose their expert witness.

[9] Response to Intervention.

adjudication hearing. We discuss the testimony in our analysis below as relevant to the issues before us.

On June 17, 2024, the family court entered Adjudication Orders on Forms AOC-DNA-4, finding as to each of the children that neglect "has been proved by a preponderance of the evidence." Further, the court found that each of the children is neglected as defined in KRS 600.020(1)(a) as follows:

The child's parent(s) . . . :

. . .

☑ Did not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being when financially able to do so or offered financial or other means to do so[.]

In addition, the family court made two single-spaced pages of specific findings, which are attached to its Adjudication Orders/Forms AOC-DNA-4, providing as follows:

The Court must find the truth or falsity of the allegations contained within the petition and the standard at this stage is preponderance [of] the evidence. The evidence clearly and conclusively proves, by a preponderance of the evidence, risk of harm -- neglect (both education and supervisory) to the [R.] children.

The testimony of Ms. Damron, [Mother], [Father] all confirm the incident of supervisory neglect of [E.R.] occurred exactly as described in the petition. . . . While [Father] denied [Al.R.] has an autism diagnosis, [Mother] confirmed both [Al.R.] and the parents' other adult son,

-10-

[Se.R.], were both diagnosed with autism at the University of Michigan. [Father] testified that . . . [Al.R.] has also experienced seizures for many years. Based [up]on their interactions with the boys, school personnel expressed concerns with [Al.R.'s] developmental functioning and expressed serious concerns for [E.R.'s] safety in [Al.R.'s] care, despite his being legally an adult. Both [Al.R.'s] developmental level as well as his seizure disorder indicate [that] he was not an appropriate supervisor for [E.R.] alone and at night in frigid temperatures and on an almost four mile walk on main roadways. Further, both parents were aware [Al.R. and E.R.] were gone from the residence in the extreme temperatures and in the dark and made minimal effort to locate them despite their being gone for several hours. . . . [Father] testified [Br.R.] (age 6) has wandered away from the residence in the road on a few occasions in the past, but he did not express concern for the behavior. . . .

The testimony of 17-year-old [Au.R.] as well as the testimony of Ms. Damron and Ms. Hopper all confirm that while the older children have, at some point, received some educational instruction (years ago [Mother] did provide homeschool instruction and then the children went to public school for at least one year while they were in foster care in another state) as evidenced by school performance and assessment as well as by assessments conducted by Dr. Duvall. However, even the older children demonstrate significant deficits in math in particular, which further corroborates [Au.R.'s] testimony and all the children's statements that they have not received any educational instruction except that which they have sought out and completed on their own and for themselves and that this has been the case for several years.

The family court also made findings regarding the younger children's

school assessments as well as those conducted by Dr. Duvall. The court found that

-11-

the school assessments indicate that Co.R. (age 12), Su.R. (age 10), E.R. (age 8), and Br.R. (age 6), cannot read. It noted that Dr. Duvall testified that his recommendations were based upon the one lesson he observed Mother conduct at his request and that he did not ask the children if instruction occurred in the home. The family court concluded that "the evidence is clear and the Court finds that no one has regularly been working with or instructing the children at all and absent continuing orders of this Court, the children are at risk of further educational and supervisory neglect."

On July 24, 2024, Parents filed a motion to alter, amend, or vacate the pre-disposition orders entered on July 17, 2024, "pursuant to CR[10] 59.05."[11] At this point, Parents argued that the family court's orders substantially burden their religious beliefs, rendering the orders both unlawful and unconstitutional under KRS 446.350.[12] The motion was heard on August 8, 2024, and it was summarily

---

[10] Kentucky Rules of Civil Procedure.

[11] CR 59.05 provides that "[a] motion to alter or amend a judgment, or to vacate a judgment and enter a new one, shall be served not later than 10 days after entry of the final judgment." CR 59.05 only applies **to final judgments**. *Pursley v. Pursley*, 242 S.W.3d 346, 347 (Ky. App. 2007). Adjudication Orders **are not final judgments**. *J.E. v. Cabinet for Health and Family Services*, 553 S.W.3d 850, 852 (Ky. App. 2018).

[12] KRS 446.350 provides that:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the

denied. (The August 8, 2024, docket sheet Order states, "Mt. O.R." -- motion overruled.)

On September 18, 2024, the family court conducted the disposition hearing and entered its Disposition Orders on Forms AOC-DNA-5. As to P.R., Ci.R., Co.R., Su.R., E.R., and Br.R., the court ordered that Parents complete all recommended services offered by CHFS and that the children "shall continue in person" at Russell County Schools. As to the two youngest children, So.R. and U.R., the court ordered Parents to complete all recommended services offered by CHFS. Further, in its corresponding docket sheet Orders, the court adopted the Cabinet's dispositional reports and incorporated them into a court Order; scheduled a review for November 7, 2024; and ordered participation in various programs.

In their appeal, Parents raise two main issues:

> 1) the lower court's findings that Parents neglected to supervise their children and failed to educate them [are] not supported by substantial evidence, and 2) the lower court's order that the parents enroll their children in a specific government school violated Parents constitutional rights under the United States and Kentucky Constitutions, as well as the statutory standards for burdening religious rights.

---

specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

-13-

Before we address Parents' arguments, we note that their brief fails to comply with Kentucky Rule of Appellate Procedure (RAP) 32(A)(4), which requires "at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." Despite the fact that the Commonwealth pointed out this deficiency in its brief, Parents have not filed a reply brief to address or remedy it. "It is not the function or responsibility of this court to scour the record on appeal to ensure that an issue has been preserved." *Koester v. Koester*, 569 S.W.3d 412, 415 (Ky. App. 2019).

As another panel of this Court recently explained in *Spainhoward v. Frasier*, No. 2023-CA-1386-MR, 2025 WL 494185 (Ky. App. Feb. 14, 2025):

> "Our options when an appellate advocate fails to abide by the rules are: (1) to ignore the deficiency and proceed with the review; (2) to strike the brief or its offending portions, [RAP 31(H)(1)]; or (3) to review the issues raised in the brief for manifest injustice only[.]" *Hallis v. Hallis*, 328 S.W.3d 694, 696 (Ky. App. 2010) (citing *Elwell v. Stone*, 799 S.W.2d 46, 47 (Ky. App. 1990)). In our discretion, we will ignore the deficiency if we are able to determine from our review of the record that their argument was properly preserved. However, any argument where no such finding can be readily made, said argument will be disregarded for review.

*Id.* at *2 (footnote omitted). We elect to follow the same approach here.

DNA proceedings are governed by KRS Chapter 620. KRS 620.010 mandates that:

> [T]his chapter shall be interpreted to effectuate the following express legislative purposes regarding the treatment of dependent, neglected and abused children. Children have certain fundamental rights which must be protected and preserved, including but not limited to, the rights to adequate food, clothing and shelter; the right to be free from physical, sexual or emotional injury or exploitation; the right to develop physically, mentally, and emotionally to their potential; and the right to educational instruction and the right to a secure, stable family. It is further recognized that upon some occasions, in order to protect and preserve the rights and needs of children, it is necessary to remove a child from his or her parents.

"DNA actions are bifurcated proceedings, i.e., they involve two distinct hearings: adjudication and disposition." *M.C. v. Cabinet for Health and Family Services*, 614 S.W.3d 915, 920 (Ky. 2021). The purpose of the adjudication hearing is to "determine the truth or falsity of the allegations in the complaint. The burden of proof shall be upon the complainant, and a determination of dependency, neglect, and abuse shall be made by a preponderance of the evidence." KRS 620.100(3). "The disposition shall determine the action to be taken by the court on behalf of the child and his parent or other person exercising custodial control or supervision." KRS 620.100(4). "Accordingly, a disposition order, not an adjudication order, is the final appealable order with regard to a decision of whether a child is dependent, neglected, or abused." *M.C.*, *supra*, at 921 (internal quotation marks and footnote omitted).

The standard of our review is set forth in *B.B. v. Cabinet for Health and Family Services*, 635 S.W.3d 802 (Ky. 2021), as follows:

> In a DNA action, the trial court has a great deal of discretion in determining whether the child is dependent, neglected, or abused. Under CR 52.01, a trial court's finding of fact shall not be set aside unless clearly erroneous[.] . . .
>
> Additionally, the trial court, as the finder of fact, has the responsibility to judge the credibility of all testimony, and may choose to believe or disbelieve any part of the evidence presented to it. If a trial court's findings of fact are supported by substantial evidence and the correct law is applied, the appellate court will not disturb the decision unless an abuse of discretion has occurred.

*Id.* at 807-08 (internal quotation marks, citations, and footnote omitted).

In the case before us, the family court based its findings of neglect upon KRS 600.020(1)(a)8., which provides in relevant part as follows:

> (1) "Abused or neglected child" means **a child whose health or welfare is harmed or threatened with harm** when:
>
> (a) His or her parent . . . :
>
> . . .
>
> 8. **Does not provide the child with adequate** care, **supervision,** food, clothing, shelter, and **education** or medical care necessary for the child's well-being when financially able to do so or offered financial or other means to do so.

-16-

(Emphasis added.) As our Supreme Court explained in *Cabinet for Health and Family Services v. K.S.*, 585 S.W.3d 202, 213 (Ky. 2019):

> As noted above, KRS 600.020(1) states: (1) "Abused or neglected child" means a child whose health or welfare is harmed *or threatened with harm* . . . .
>
> It follows from this definition that where a child whose health or welfare is *threatened* with harm, that is, whose health or welfare has not actually been harmed but where there is a clear and convincing *threat* of harm to a child, a trial court is authorized under this definition to find that the child is an abused or neglected child.

(Emphasis original.)

Parents contend that the family court erred in finding that they failed to supervise their children. In essence, they reargue their case and ask us to reweigh the evidence and impermissibly substitute our judgment for that of the family court. "[J]udging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). "[A] reviewing court is not permitted to substitute its judgment for that of the family court, unless its findings are clearly erroneous. A factual finding is not clearly erroneous if it is supported by substantial evidence." *Bailey v. Bailey*, 231 S.W.3d 793, 796 (Ky. App. 2007) (internal quotation marks and citations omitted).

Ms. Damron testified at the adjudication hearing about her March 18, 2024, encounter with E.R. and Al.R. She holds a Master's Degree in school

counseling, and her experience includes chairing special education meetings and signing off on referrals and placements for children with special needs. According to Ms. Damron, Al.R. said that he had brought E.R. to the school grounds in order for E.R. to attend school for a day to learn about dinosaurs. Ms. Damron explained that she knew where the family lived. She was concerned that the temperature outside was 37 degrees and that Al.R. and E.R. had walked there -- about a 3.7 mile walk. Ms. Damron did not want Al.R. and E.R. to walk back home in the cold, and so she arranged for the school resource officer, a deputy sheriff, to drive the children home. Ms. Damron was concerned about Al.R.'s demeanor and his ability to supervise a child to walk that far because he did not seem to have the adult mentality or capacity to do so. Ms. Damron was also concerned because E.R. had on open shoes without socks, his hair was matted, his fingernails were caked with dirt, he was extremely dirty, and he smelled of feces.

Father testified at the adjudication hearing. He works a night shift and usually sleeps until 2:30-3:00 p.m. With respect to the March 18, 2024, incident regarding E.R. and Al.R., Father testified that it was unusual because Al.R. usually does not interact with E.R. at all -- let alone go for a walk with him. Father did drive around by the technical college to look for the boys but then left to go to work and just assumed that they would be back before long. According to Father, Al.R. has epilepsy and has had multiple seizures over the last eight years. Father

testified that Al.R. has some difficulty with his speech and that although he may come across as mentally impaired, he is not. Father testified that Al.R. has not been diagnosed with autism. However, in direct contradiction, Mother testified that Al.R. had been tested and diagnosed with autism at the University of Michigan.

Father testified that he did not know why E.R. smelled and suggested that perhaps the child had had an accident. Father testified that he lives in the same house and that he would never let the children leave the house if they smelled bad. Yet, according to Ms. Hopper, the RTI teacher, the children had hygiene issues and "very evident body odor" when they came to school. Ms. Damron testified that she had received calls from all three of the schools since the children were enrolled in public schools with concerns about the children's "hygiene, smells. They've given them deodorant and baby wipes to clean up with. There've been lots of concerns about hygiene and bathing." Further, Ms. Damron testified that there have been concerns that the children's clothing was not always clean.

Father testified that he had heard -- after the fact -- that Br.R. (age 6) had wandered off, that she had been down the street, and that "somebody" had brought her back. He denied that that had happened frequently. Father testified that their neighborhood is not conducive to walking because there are no sidewalks. They live on a dead-end street off a side road. At first, Father testified

that it was a busy side road, but then he said that it was not busy. Father testified that Br.R. has gone down to the end of their street where the school bus stop is once or twice. According to Father, Br.R. "will kind of stay on our property, but at the same time, you know, we have like two acres and we're like, where is she? And she'll be out, you know, out back by the creek, you know we got to find her." Due to Br.R.'s tendency to wander, they had gotten a tracking device for her more than two years ago.

Au.R. testified that the parents sleep most of the day. Father goes to work after 4:00 p.m., but before that time he is sleeping or getting ready for work. Au.R. testified that Mother usually sleeps until 2:00 p.m.

"The purpose of the dependency, neglect, and abuse statutes is to provide for the health, safety, and overall wellbeing of the child. KRS 620.010. . . . [T]he family court certainly does not have to wait for actual harm to occur before taking protective measures." *Cabinet for Health and Family Services on behalf of C.R. v. C.B.*, 556 S.W.3d 568, 574, 576 (Ky. 2018). "KRS 600.020(1) plainly provides that neglect occurs if the child's welfare is 'harmed or threatened with harm.'" *M.C. v. Commonwealth*, 347 S.W.3d 471, 472 (Ky. App. 2011). We are satisfied from our review of the record that ample evidence supports the family court's findings based upon supervisory neglect. Clearly, the children's welfare

was harmed or threatened with harm as a result of the failure of Father and Mother to provide adequate supervision.

We next turn to the issues regarding educational neglect. Parents contend that they could not neglect the education of Br.R., So.R., or U.R. because those three children were under compulsory school age as of the date the DNA petitions were filed. In *Commonwealth v. H.K.*, 595 S.W.3d 498 (Ky. App. 2019), this Court held that a DNA petition could not properly be brought based upon educational neglect of a child who was not of compulsory school age:

> Pursuant to our education laws, "[b]eginning with the 2017-2018 school year, any child who is six (6) years of age, or who may become six (6) years of age by August 1, shall attend public school[.]" KRS 158.030(2). A child who is five years of age by August 1, "*may* enter a primary school program[.]" *Id.* (Emphasis added). This gives parents of a five-year-old the discretion to decide whether the child will attend.
>
> . . .
>
> . . . [B]ecause it is optional to send a five-year-old to school, mother could not educationally neglect child because child was only five years old when she was excessively absent.

*Id.* at 499-501 (emphasis original).

In the case before us, the DNA petitions were filed on March 25, 2024. The school year at issue was 2023-24. Br.R. is the eldest of the three children in question. The record reflects that she was born in February 2018, and

-21-

thus she was only five years of age by August 1, 2023. Consequently, Parents could not educationally neglect Br.R. or her two younger siblings. We agree that the family court erred in finding educational neglect *as to Br.R., So.R., and U.R.* Therefore, we vacate that portion of the court's Order and remand for entry of an Order correcting this error with respect to Br.R., So.R., and U.R.

However, with respect to the other five minor children, we conclude that the family court's determination of educational neglect has a substantial evidentiary foundation. To recapitulate, Ms. Damron testified that when she encountered Al.R. and E.R. at the school grounds, Al.R. related that E.R. had not been in homeschool and that the parents had stopped homeschooling several years before. Ms. Damron testified that she asked E.R. why he wanted to come to school. He said he wanted to learn to read and that he only knew how to spell two words, "poop" and "no." Al.R. related that he had been able to attend one year of high school and that although some of the older children had been homeschooled at one time some, the parents **had stopped homeschooling several years** before. The younger children had had no homeschooling at all.

Ms. Damron testified that following the temporary removal hearing, she met with the children at home after the court had ordered that they be interviewed by someone at the school. What she found was "spot-on" with what Al.R. had said. According to Ms. Damron, the older children reported that there

was initially some homeschooling when they were younger; then while they were in foster care, they had learned to read in public school. When they came back home, there had been no more education. The children who had not been in public school -- Su.R. (age 10), E.R. (age 8), and Br.R. (age 6) -- had had no schooling at all. Ms. Damron also testified about the testing that was administered to the children, which was consistent with her interviews with the children and with what Al.R. had told her.

In addition, Au.R. testified that she does not believe that her siblings are receiving homeschooling. Au.R. testified that if she had not been motivated to get her education on her own, Parents would not have required her to do anything.

Parents focus heavily upon Dr. Duvall's reports and testimony. Again, they reargue their case. It is the family court's prerogative to choose which evidence to believe. *B.B. v. Cabinet*, *supra*. The family court was clearly not persuaded by his presentation.

We agree with the Commonwealth that this case is highly analogous to *M.C. v. Commonwealth*, 347 S.W.3d 471. In *M.C.*, a DNA petition was filed against the mother based upon the child's unexcused absences and tardies. This Court explained that "[o]ne of the legislative purposes of the dependency, neglect, and abuse statutes is to protect a child's fundamental right to educational instruction." *Id.* at 473. This Court held that the mother's "repeated inability to

ensure Child attended school each day presented a threat of harm to Child's welfare by denying Child the right to educational instruction." *Id.*

In the case before us, substantial evidence of record ably and amply supports the family court's finding that no one has regularly been "working with or instructing the children **at all**[.]" (Emphasis added.) Without question, the failure of Father and Mother to provide the children with adequate education harmed or presented a threat of harm to their welfare by denying them the right to educational instruction.

To the extent that Parents have raised issues about the specificity of the family court's supervisory and/or educational neglect findings, we conclude that they are unpreserved for our review. In *Anderson v. Johnson*, 350 S.W.3d 453 (Ky. 2011), our Supreme Court examined the trial court's duty to make findings of fact and conclusions of law under CR 52.01[13] and the litigant's duty under CR 52.04[14] to "make a written request of the court or file a motion requesting *a* finding

---

[13] In relevant part, CR 52.01 provides that: "In all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment . . . . Requests for findings are not necessary for purposes of review except as provided in Rule 52.04."

[14] CR 52.04 provides that "[a] final judgment shall not be reversed or remanded because of the failure of the trial court to make a finding of fact on an issue essential to the judgment unless such failure is brought to the attention of the trial court by a written request for a finding on that issue or by a motion pursuant to Rule 52.02." CR 52.02 provides in relevant part that, "[T]he court . . . on the motion of a party made not later than 10 days after entry of judgment, may amend its findings or make additional findings and may amend the judgment accordingly."

of fact *essential to the judgment* when the court has omitted it." *Id.* at 458 (italics original). The Court held that where (as here) the trial court has made at least a good faith effort at fact-finding and included the found facts in a written order, then CR 52.04 applies. It does not appear that Parents filed a written request for additional findings or post-judgment motion as required by CR 52.04. Their failure to do so precludes appellate review.

Next, Parents contend that the family court violated their constitution rights by compelling them to enroll their children in Russell County Schools. They cite Section 5 of the Kentucky Constitution (No man shall "be compelled to send his child to any school to which he may be conscientiously opposed") and KRS 446.350 (Government may not substantially burden a sincerely-held religious belief unless it proves by clear and convincing evidence that it has a compelling governmental interest and has used least restrictive means to further that interest). Mother testified at the adjudication hearing that she felt called by God to homeschool. However, as testimony clearly established, she did not obey that call and elected to do no home instruction for years. Nonetheless, she objected to public school curriculum because a lot of it was contrary to the Bible and was not biblically sound. Father was asked if he had any concerns about religious-type issues regarding his choice of school and testified, "Not really. That's not really an issue for me. They're not talking about religion in school."

At page 20 of their brief, Parents state that the family court "issued no conclusions of law as to [their] constitutional challenge, and so it never identified a compelling interest[.]" In other words, the court did not rule on Parents' constitutional argument nor did it make findings of fact with respect to that issue. Thus, in order to properly preserve the issue for appellate review, it was incumbent upon Parents to bring it to the court's attention under CR 52.04. *Wieland v. Freeman*, 671 S.W.3d 253, 256 (Ky. 2023) ( Failure of party to insist on ruling by circuit court on issues means that they are not properly preserved for appellate review.). It does not appear that they did so. Additionally, parents failed to include a preservation statement as required by RAP 32(A)(4), and we consider the issue to be unpreserved. *Ford v. Commonwealth*, 628 S.W.3d 147, 155 (Ky. 2021) (If party fails to inform appellate court of where in the record issue is preserved, appellate court can treat that issue as unpreserved.).

Accordingly, we affirm the Orders of the Russell Circuit Court in: No. 2024-CA-1287-ME (Ci.R.); No. 2024-CA-1290-ME (P.R.); No. 2024-CA-1288-ME (Co.R.); No. 2024-CA-1292-ME (Su.R.); and 2024-CA-1289-ME (E.R.).

With respect to the cases involving the three youngest children: No. 2024-CA-1286-ME (Br.R.); No. 2024-CA-1291-ME (So.R.); and No. 2024-CA-1293-ME (U.R.), we affirm in part, vacate in part, and remand solely to correct the

Order pertaining to educational neglect, noting again that these three children have not yet attained the age that would subject them to compulsory school attendance.

ALL CONCUR.

BRIEF FOR APPELLANT:

Adrienne Southworth
Lawrenceburg, Kentucky

BRIEF FOR APPELLEE:

Kevin S. Shearer
Jamestown, Kentucky